IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WANDA L. VELAZQUEZ, | ) | Case No. 1:19-cv-2474 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Wanda L. Velazquez, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Velazquez's applications for DIB and SSI be affirmed.

## II.      Procedural History

On May 17, 2016, Velazquez applied for DIB and SSI.  (Tr. 184-93).[1]  Velazquez alleged that she became disabled on August 21, 2015, due to "carpal[] tunnel hands, neuropathy[ ]hands, diabet[e]s, insulin dependent, [high blood pressure], asthma, lower back, heart condition, and

---

[1] The administrative transcript appears in ECF Doc. 11.

vis[]ion."  (Tr. 184, 188, 207).  The Social Security Administration denied Velazquez's claims initially and upon reconsideration.  (Tr. 73-114).  Velazquez requested an administrative hearing. (Tr. 137-38).  ALJ Gonzalo Vallecillo heard Velazquez's case on September 18, 2018, and denied the claims in a November 6, 2018, decision.  (Tr. 11-55).  On August 27, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-8).  On October 23, 2019, Velazquez filed a complaint to obtain judicial review of the Commissioner's decision.  ECF Doc. 1.

**III.     Evidence**

**A.     Personal, Educational, and Vocational Evidence**

Velazquez was born on October 2, 1959.  (Tr. 184).  She was 55 years old on the alleged onset date and 59 years old on the date of the ALJ's decision, making her a "person of advanced age" for the entire relevant period.  20 C.F.R. §§ 404.1563(e), 416.963(e) (defining "person of advanced age" as 55 years old through 59 years old).  Although Velazquez was more comfortable speaking Spanish, she conceded at the ALJ hearing that her proficiency in English made language a non-issue.  (Tr. 37).  Velazquez had a 10th grade education.  (Tr. 208).  She had previous work experience as an assembler and as a child monitor.  (Tr. 50-51, 209, 217-21).

Velazquez moved from Ohio to Florida in March 2015, and she moved back to Ohio at some point between June and October 2017.  (Tr. 489) (indicating that Velazquez moved to Florida three months before a June 2015 medical appointment); (Tr. 721, 757) (medical records reflecting treatment in Florida in June 2017 and treatment in Ohio in October 2017).  Velazquez was a Florida resident when she filed her applications for DIB and SSI and when she requested an ALJ hearing.  (Tr. 137-38, 184-93).  She was an Ohio resident when she filed her request for Appeals Council review and when she filed her complaint to obtain judicial review. (Tr. 178-83); ECF Doc. 1.

**B.      Relevant Medical Evidence**

On March 12, 2014, Virginia Brugger, CNP, noted that Velazquez had stable diabetes mellitus, which had begun in 2008.  (Tr. 305-06).  She also had diabetic neuropathy and polyneuropathy related to her diabetes, she was overweight, and she smoked cigarettes. (Tr. 305).  Velazquez managed her neuropathy with Lyrica and gabapentin, and she was compliant with her medications.  (Tr. 305-06).  Velazquez reported cold and heat intolerance, chest pain, irregular heartbeat, gait disturbance, and bone and joint weakness.  (Tr. 307-08).  On examination, she had regular heart rate and rhythm, normal dorsalis pedis pulses, and no noted abnormalities in her extremities or musculoskeletal system.  (Tr. 309).  At a follow-up on May 27, 2014, Velazquez told Brugger that she had pain in her feet, which was worse when walking and standing.  (Tr. 313).  Brugger ordered an electromyogram ("EMG") of Velazquez's extremities to evaluate her neuropathy and continued her Lyrica.  (Tr. 312).  On August 26, 2014, Velazquez told Brugger that she had piercing pain, numbness, swelling, and tingling in her feet and legs.  (Tr. 323).  Nothing relieved her symptoms.  (Tr. 323).  On examination, Velazquez was found to have "normal" function in all physical faculties, including her extremities.  (Tr. 327).  On September 23 and December 22, 2014, Velazquez reported that she had 0/10 pain.  (Tr. 334, 340-41).  On September 23, 2014, all physical examination findings were "normal, and she had an effused right knee with patellofemoral tenderness on December 22, 2014.  (Tr. 334, 340-41).

On July 2, 2014, Darshan Mahajan, MD, took an EMG to evaluate Velazquez's hand numbness.  (Tr. 388).  Dr. Mahajan found borderline distal sensory latency in the right median nerve and mild denervation changes in the thenar muscles bilaterally, but her hands were otherwise normal.  (Tr. 388).  Dr. Mahajan stated that the studies were consistent with mild right median nerve compression neuropathy and mild right carpal tunnel syndrome.  (Tr. 388).  Dr.

Mahajan recommended conservative management with wrist splints, hand therapy, and analgesics.  (Tr. 388).

On June 16, 2015, Velazquez told Alexandra La Puente, ARNP, that she had discomfort in her feet and needed a medication refill.  (Tr. 489).  Velazquez explained that she had moved to Florida three months before her appointment and had been without medication for four days.  (Tr. 489).  Velazquez reported decreased concentration, restlessness, fidgeting, depression with feelings of hopelessness, trouble sleeping, anhedonia, thoughts of dying or self-harm, and low self-esteem.  (Tr. 489).  On examination, Velazquez had no sensory abnormalities, no motor dysfunction, normal balance, and normal gait and stance.  (Tr. 492).  La Puente prescribed gabapentin to help with Velazquez's neuropathy and recommended a low sodium diet with regular exercise.  (Tr. 493).  At a follow-up on September 16, 2015, Velazquez told La Puente that she had numbness, tingling, and bone pain in her feet and constant pain in her joints. (Tr. 480).  She denied any weakness.  (Tr. 480).  A monofilament exam of the right and left feet yielded abnormal results, but Velazquez had no erythema, deformity, calluses, decreased responses to stimulation, or other noted abnormalities in her feet.  (Tr. 483).  Velazquez also had a trigger middle finger on her left hand.  (Tr. 483).  La Puente continued Velazquez's gabapentin prescription, added Voltaren gen for her unspecified joint pain, and recommended that Velazquez lose weight and exercise regularly.  (Tr. 486-87).

On January 5, 2016, Velazquez told Kathryn Syed, MD, that she had pain in her shoulders; joint pain in her knees, shoulders, fingers, and ankles; and bilateral wrist pain, numbness, and tingling.  (Tr. 472).  Dr. Syed noted that Velazquez had used gabapentin three times per day in the past, which had helped.  (Tr. 472).  Dr. Syed did not note any musculoskeletal symptoms on examination, other than arthralgias.  (Tr. 474-75).  Dr. Syed continued Velazquez's gabapentin and recommended regular exercise.  (Tr. 476-77).

4

On May 24, 2016, Velazquez told Kenneth Argote, ARNP, that she had foot pain, a lump on her hands, joint pain, and neuropathy.  (Tr. 465).  She also said that gabapentin had not given her relief.  (Tr. 465).  On examination, Argote noted that Velazquez's musculoskeletal function was "[o]verall . . . normal"; she had normal balance, gait, and stance; and she had no erythema, deformity, or callus on the plantar aspect of her feet.  (Tr. 468).  Argote continued Velazquez's gabapentin, directed her to take medication as prescribed, and recommended that she lose weight and exercise regularly.  (Tr. 469-70).  At follow-ups on June 14 and August 3, 2016, and February 2 and 14, April 4, and June 5, 2017, examination findings for Velazquez's back, abdomen, musculoskeletal system, and gait and stance were normal.  Tr. 509-11, 516, 594-95, 600-01, 605-07, 631-32).  Argote continued his recommendation that Velazquez lose weight and exercise regularly.  (Tr. 509-11, 516, 594-95, 600-01, 605-07, 631-32).  On October 4, 2016, Argote noted that Velazquez had not been taking her medications as prescribed and that a 10-g monofilament exam of both feet yielded "normal" findings.  (Tr. 609, 612).

On August 5, 2016, Bhupendra Gupta, MD, examined Velazquez and completed a "disability evaluation" assessing her physical capacity.  (Tr. 766-74).  Velazquez told Dr. Gupta that she had severe neuropathy in both legs and hands, carpal tunnel syndrome, difficulty standing and balancing for long periods, swollen feet, severe pain, diabetes, arthritis, chest pain, shortness of breath, high blood pressure, nervous disorder, asthma, and anxiety.  (Tr. 766).  Velazquez also said that she could walk for half a mile.  (Tr. 766).  On examination, Velazquez had good appearance, clear lungs without wheezing, and normal cardiovascular functions.  (Tr. 767).  All joints showed no evidence of tenderness, swelling, erythema, heat, crepitus, or deformity.  (Tr. 767).  She was neurologically intact.  (Tr. 768).  She had no skin lesions on her back and her shoulder and pelvic tilt were normal.  (Tr. 768).  Her deep tendon reflexes were normal.  (Tr. 768).  Her spine was normal.  (Tr. 768).  Her sensory function was normal.  (Tr.

768).  Velazquez had full strength in her shoulders, elbows, wrists, hands, hips, knees, and ankles.  (Tr. 768-69).  Her posture was normal; she sat, stood, and walked with ease and without assistance; she could walk for 60 feet without dyspnea or chest pain; she could dress and undress herself; and she could turn knobs.  (Tr. 769).  Dr. Gupta also noted that "[e]xcellent grip strength [was] present in both hands.  Manipulation in both hands [was] fine."  (Tr. 769).

On August 31, 2016, Velazquez saw Shrinath Kamat, MD, for a neurological evaluation and treatment of her pain and dysesthesia related to her neuropathy and hand weakness.  (Tr. 585).  Velazquez reported that she had tingling and numbness in her hands, and that gabapentin had no longer helped.  (Tr. 585).  On examination, Dr. Kamat noted that Velazquez had mild weakness in both hand grips, positive Phalen's test with impaired sensation over the palm of the hand, and stocking and glove sensory deficits in both lower extremities.  (Tr. 585).  Dr. Kamat also noted that Velazquez had normal range of motion, normal sensation, and "normal motor function (except both hand grips 4-4 minus)."  (Tr. 586).  Dr. Kamat recommended Velazquez take vitamins and scheduled a nerve conduction velocity exam ("NCV") and EMG for her legs and arms.  (Tr. 587).  On September 6, 2016, the NCV and EMG revealed that all nerve conduction was within normal limits and that there was no evidence of electrical instability in all examined muscles. (Tr. 579-84).  On November 10, 2016, Dr. Kamat explained that the NCV and EMG results indicated that Velazquez might have had neuritis related to her uncontrolled blood sugar levels and told Velazquez that controlling her diabetes was extremely important. (Tr. 575).  Dr. Kamat added Cymbalta to Velazquez's prescriptions.  (Tr. 575, 577).  At a follow-up on March 9, 2017, Velazquez told Dr. Kamat that she continued to have pain in her leg and feet, discomfort and swelling in her right palm, and "little" help from her medications.  (Tr. 571).  On examination, Dr. Kamat noted that Velazquez had normal range of motion, and she advised Velazquez to see a hand specialist.  (Tr. 571-72).

On April 17, 2017, Velazquez told Scott Gargasz, MD, that she had pain in her right hand, swelling around her fingers since January 2017, locking fingers in her left hand, and numbness and tingling in both hands.  (Tr. 732).  Examination showed trigger finger in Velazquez's right middle, right ring, and left ring fingers; a ganglion cyst in her left wrist; palmar fascial fibromatosis; and bilateral carpal tunnel syndrome.  (Tr. 733).  Dr. Gargasz also noted that Velazquez had a normal gait; had normal range of motion in her fingers, wrists, and elbows; and was able to perform full work duty/activity.  (Tr. 732-33).  Dr. Gargasz recommended occupational or physical therapy to treat her trigger fingers and a trigger finger release surgery.  (Tr. 733).  Dr. Gargasz performed the surgery on April 28, 2017.  (Tr. 728-31).  On May 1, 2017, Velazquez called Dr. Gargasz's office, and Jonathan Millan noted that Velazquez had said "she has no pain and has been able to straighten her fingers."  (Tr. 727).  On May 11, 2017, Velazquez saw Dr. Gargasz for suture removal, and she said that she had pain at the incision sites and stiffness to range of motion in her right hand.  (Tr. 724).  She denied any pain in her left hand.  (Tr. 724).  Dr. Gargasz continued his recommendation for occupational or physical therapy.  (Tr. 725).  On June 22, 2017, Velazquez said that she had some pain at the incision site, had some stiffness in her right hand, and had attended therapy.  (Tr. 721).  Examination showed that all tendons were intact, and Dr. Gargasz said that she could perform full work duty/activity.  (Tr. 722).

On October 10, 2017, Velazquez established care with Jeremiah Noggle, NP.  (Tr. 757).  Noggle noted that Velazquez denied having any arthralgia, injury, myalgia, paresthesia, stiffness, or loss of strength.  (Tr. 757).  Examination showed regular respiration, regular heart rate and rhythm, and normal gait and station.  (Tr. 758).  At follow-ups on October 24, 2017, and January 5 and May 2, 2018, Velazquez again denied having any arthralgia, injury, myalgia, paresthesia, stiffness, or loss of strength.  (Tr. 743, 749, 755).  And examinations showed regular respiration,

regular heart rate and rhythm, and normal gait and station.  (Tr. 744, 750, 756).  On October 24,

2017, Velazquez told Noggle that she wanted to have her left wrist ganglion cyst removed.  (Tr.

755).

On November 21, 2017, Michael Stanich, DO, performed the ganglion cyst excision

without complication.  (Tr. 753).  On November 22, 2017, Dr. Stanich noted that the incision site

looked good.  (Tr. 762).

Unsigned records from Healthridge Medical Center on March 28, 2018, show that

Velazquez said that she had intermittent trigger finger in her left ring finger, but she denied any

loss of strength.  (Tr. 747).  Physical examination showed normal gait and station and

intermittent trigger finger in the left ring finger.  (Tr. 748).  Velazquez was referred to Dr.

Stanich for surgery.  (Tr. 748).  On April 4, 2018, Velazquez received a steroid injection in her

finger.  (Tr. 746).  The medical record stated that, if she did not improve after three weeks, a

trigger finger release would be the next step.  (Tr. 746).

### C.    Supplemental Questionnaire

On September 4, 2016, Velazquez completed a "supplemental cardiac questionnaire."

(Tr. 234-37).  Velazquez indicated that she believed she could not work due to "no strength in

hands [and] legs[ and] neuropathy."  (Tr. 235).  She said that she could walk up to 15 minutes

before pain and weakness caused her to stop.  (Tr. 235).  She said that she could climb for 5 steps

before stopping, could not lift more than 5 pounds, and would drop cooking spoon while

cooking.  (Tr. 236).

### D.    State Agency Consultants' Opinions

Mariah Hammond, SDM, interviewed Velazquez and reviewed her medical records to

determine whether she was disabled at the initial review stage.  (Tr. 76-80).  On June 14, 2016,

Hammond noted that Velazquez "spoke English well" and "answered most of [her] questions

8

before the interpreter could even translate them," but she had asked for an interpreter because "Spanish [was] easier for her."  (Tr. 76).  On August 8, 2016, Hammond noted that Velazquez did not allege any mental health impairments and that she did not have any severe impairments limiting her functional capacity based on Dr. Gupta's consultative examination findings.  (Tr. 77-79).  Thus, Hammond found that Velazquez was "not disabled."  (Tr. 80).  On August 30, 2016, Whitney Kenny, Jack Rothman, MD, and Jennifer Meyer, Ph.D., reviewed the medical records and initial report and concurred with the finding that Velazquez's impairments were all non-severe.  (Tr. 94-100).

### E.     Relevant Testimonial Evidence

At the outset of the ALJ hearing, the ALJ asked counsel if Velazquez and counsel had had an opportunity to review the case file, whether they had any objections to it, and whether they had any additional information to submit.  (Tr. 34-35).  Counsel told the ALJ that there were no objections.  (Tr. 35).  Counsel also stated that Velazquez had moved to Ohio while she was awaiting the ALJ hearing, and that she had additional records to submit from her physician in Ohio.  (Tr. 35).  The ALJ also noted that there was a date-last-insured issue in the case, and counsel indicated that he would send the ALJ records related to Velazquez's date last insured.  (Tr. 35).  Counsel also stated, during opening arguments, that Velazquez "communicate[d] well enough" in English that her communication would not "be an issue."  (Tr. 37).  The ALJ also asked if "[w]e have an RFC here?"  (Tr. 38).  And counsel said, "[n]o."  (Tr. 38).

Velazquez testified at the ALJ hearing.  (Tr. 38-49).  Velazquez said that in a typical day, she would wake up around 7:00 or 8:00 AM, have coffee with her niece, take her medications, and lie in bed.  (Tr. 44, 48-49).  Velazquez said that she did "very little" housework.  (Tr. 42).  She could dust and wipe tables, but she could not empty the dishwasher because that required her to continuously open and close her hand.  (Tr. 41-42).  She could sign her name and write, but

9

she had trouble holding a pencil for a long time.  (Tr. 41).  Velazquez grocery shopped with her

boyfriend, but she would use a motorized cart because her vision would get cloudy.  (Tr. 43).

She said that she could sit for up to half an hour and stand in one spot for about five to ten

minutes.  (Tr. 43-44).  Velazquez said that she could lift and carry four pounds.  (Tr. 44).  She

often elevated her feet when sitting.  (Tr. 44).  Velazquez said she could not make a fist or pick

up small items from a table, but she could pick up items like buttons, coins, and paperclips.  (Tr.

47).

Velazquez testified that she last worked on an assembly line in 2008 or 2009, but she had

difficulty standing for long periods due to her foot problems.  (Tr. 38-39).  She said that she had

missed work due to her leg pain.  (Tr. 39).  Velazquez said that her neuropathy had become more

complicated after she stopped working because it started affecting her hands.  (Tr. 39).  Her foot

pain felt like needles and radiated to her legs and knees when she sat down or stood for a long

period.  (Tr. 39).  Velazquez testified that she had carpal tunnel, trigger finger, and difficulty

holding things in her hands.  (Tr. 40).  Velazquez said that gabapentin helped a little, but it made

her dizzy.  (Tr. 40).  She took medication for depression, which made her feel sleepy.  (Tr. 42).

She also said that she would smoke, self-isolate, and spend an entire day sleeping whenever she

felt depressed.  (Tr. 42).

Stephanie Barnes, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 49-

54).  The VE testified that Velazquez's prior work was as an "assembler," which was medium,

unskilled work.  (Tr. 50).  The VE also testified that Velazquez had described working from

2010 through 2014 as a child monitor, which was medium semi-skilled work.  (Tr. 51).  The ALJ

asked the VE whether a hypothetical individual with Velazquez's age, education, and experience

could work if she were able to perform work at all exertional levels but could "never climb

ladders, ropes or scaffolds.  Should avoid concentrated exposure to hazards.  The individual may

frequently handle and finger bilaterally." (Tr. 51).  The VE said that such an individual could perform Velazquez's prior work and could perform other work such as laundry worker, dietary aide, and janitor or cleaner.  (Tr. 52).  The VE testified that, if the individual were additionally limited to medium exertion, she could perform the same work.  (Tr. 52).  If the individual in the second hypothetical could only stand or walk for three hours in an eight-hour workday, she could not perform Velazquez's past work, or the other work identified, because she would be limited to light work.  (Tr. 52-53).  If the individual in the first hypothetical were limited to occasional handling and fingering bilaterally, the VE testified that she could not perform any work.  (Tr. 53).

Counsel asked the VE whether an individual who "would take a number of breaks throughout the day that would keep them off task and not actually working at least 15 percent of the workday" could maintain competitive employment.  (Tr. 54).  The VE said, "no."  (Tr. 54).

## IV.    The ALJ's Decision

The ALJ's November 9, 2018, decision found that Velazquez was not disabled and denied her claims for DIB and SSI.  (Tr. 17-26).  The ALJ found that Velazquez had the severe impairments of "diabetes mellitus with diabetic neuropathy; other unspecified athropathy; tenosynovitis of the left ring finger; and essential hypertension."  (Tr. 20).  The ALJ also noted that Velazquez had other conditions (including a ganglion cyst of the left wrist), but those symptoms were "well-controlled" and had no more than a minimal impact on her ability to perform work activities.  (Tr. 20).

At Step Three, the ALJ found that Velazquez did "not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."  (Tr. 20).  The ALJ expressly stated

that he "considered all of [Velazquez's] impairments individually and in combination."  (Tr. 20).

Further, the ALJ explained that:

> As of June 7, 2011, the agency discontinued use of the listings in section 9.00, Endocrine disorders, including 9.08, Diabetes Mellitus.  There is now no corresponding listing for claimant's diabetes mellitus.  However, on June 2, 2014 SSR 14-2p Evaluating Diabetes Mellitus became effective and provides that the effects of diabetes mellitus, either alone or in combination with another impairment(s), may meet or medically equal the criteria of a listing in an affected body system(s).  The rules goes on to provide some examples of the effects of diabetes and the body systems under which we evaluate them: Amputation of an extremity, under the musculoskeletal system listings (1.00); diabetic retinopathy, under the special senses and speech listings (2.00); hypertension, cardiac arrhythmias, and heart failure, under the cardiovascular system listings (4.00); gastroparesis and ischemic bowel disease (intestinal necrosis), under the digestive system listings (5.00); diabetic nephropathy, under the genitourinary impairments listings (6.00); slow-healing bacterial and fungal infections, under the skin disorders listings (8.00); diabetic neuropathy, under the neurological listings (11.00); cognitive impairments, depression, anxiety, and eating disorders, under the mental disorders listings (12.00).  I have evaluated the evidence of claimant's diabetes mellitus and considered its effects on other body systems as it relates to these listings and others, and none of the effects of the claimant's impairments either singly or in combination, medically meets or equals any of the Listed Impairments contained in Appendix 1, subpart P, Regulations No. 4.

(Tr. 20-21).

The ALJ found that Velazquez had the RFC to perform a full range of work at all exertional levels, except that she could "never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to hazards; and may frequently handle and finger bilaterally."  (Tr. 21).  In assessing Velazquez's RFC, the ALJ stated that he "considered all symptoms" in light of the medical and other evidence.  (Tr. 21).  The ALJ noted that Velazquez reported that she could not stand for very long because she lost her balance, had swollen feet and severe pain, could stand for 5 to 10 minutes at a time, could lift and carry up to 4 pounds, and elevated her feet most of a typical day.  (Tr. 22).  The ALJ found that Velazquez's "medically determinable impairments could be reasonably expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence, and limiting effects of these symptoms" were not consistent

12

with the medical and other evidence in the record.  (Tr. 23).  The ALJ also exhaustively

summarized the medical evidence from August 2016 through the date of the decision, noting

that: (1) imaging in August 2016 and an EMG in September 2016 yielded normal results; (2) her

right trigger finger was successfully released; (3) examination findings in January, May, and

August 2016 and February 2017 showed a normal musculoskeletal system, balance, and gait;

(4) records showed that she did not have decreased response to pain or temperature stimulation

in her feet; (5) she denied arthralgias, myalgias, paresthesia, and stiffness and had a normal gait

and station in May 2018; and (6) Dr. Gupta found that she had 5/5 strength in her extremities,

could sit and stand with ease, could walk with ease and with assistance, had a steady gait, and

had excellent grip strength and fine manipulation in both hands.  (Tr. 22-23).  The ALJ also

noted that he gave "great weight" to Dr. Rothman's opinion and the state agency psychological

consultants' opinions.  (Tr. 23-24).

     Based on the VE's testimony and Velazquez's RFC, the ALJ found that Velazquez was

capable of performing her prior work as an assembler and child monitor.  (Tr. 24).  The ALJ also

alternatively found that: (1) the Medical-Vocational guidelines would direct a finding of "not

disabled" for someone with Velazquez's age, experience, education, and RFC; and (2) the VE's

testimony also supported a "not disabled" finding because an individual with Velazquez's age,

experience, education, and RFC could perform the requirements of representative occupations,

such as laundry worker, dietary aide, and janitor/cleaner.  (Tr. 25).  Thus, because Velazquez

could perform her past work, was not disabled under the Medical-Vocational Guidelines, and

was able to perform other work in the national economy, the ALJ found that Velazquez was not

disabled from August 21, 2015, through the date of his decision and denied her claims for DIB

and SSI.  (Tr. 26).

13

### V.      Law & Analysis

#### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

14

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    Incomplete Record, *Res Judicata*, and Collateral Estoppel

Velazquez first argues that the administrative record is incomplete because it contains an October 2013 hearing transcript, but it does not contain the related January 2014 ALJ decision denying her benefits or the April 2015 Appeals Council decision denying further review.  ECF Doc. 13 at 9.  Velazquez asserts that "[e]ven though not mentioned in [the ALJ's November 2018] decision, the decision of the ALJ may be affected by *res judicata*.  It is difficult to definitely determine the issues based on this incomplete file."  ECF Doc. 13 at 9.

The Commissioner responds that Velazquez's incomplete-record and *res judicata* arguments are forfeited because: (1) she did not preserve the argument for judicial review by raising it at the administrative level, but had instead conceded that she did not have any objections to the record at the ALJ hearing; and (2) did not adequately develop her arguments with any citations to authority.  ECF doc. 16 at 3-5.  Further, the Commissioner argues that Velazquez's argument would be meritless if reviewed because: (1) *res judicata* does not apply when the disability period for and evidence supporting a subsequent claim does not overlap with the disability period from a prior decision; and (2) HALLEX I-2-1-13 does not require the record to include the prior adjudication under such circumstances.  ECF Doc. 16 at 4.  Moreover, the Commissioner argues that any error in failing to adopt a prior denial of benefits would be harmless and could not serve as the basis for reversal.  ECF Doc. 16 at 5.

In her reply brief, Velazquez argues – for the first time – that the ALJ's failure to include, consider, and adopt the prior RFC assessment *might have* violated *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997) and Acquiescence Ruling 98-4(6).  ECF Doc. 17 at 1-2.  Velazquez also asserts that the ALJ's failure to adopt the prior adjudication regarding the requirements of

her prior work *might have* violated *Dennard v. Sec'y of Health and Hum. Serv.*, 907 F.2d 598 (6th Cir. 1990) and Acquiescence Ruling 98-3(6).  ECF Doc. 17 at 2.  The Commissioner responds that Velazquez's attempt to develop her argument in her reply brief does not avoid its forfeiture – especially when her initial brief made only passing reference to *res judicata* (claim preclusion) and her reply brief addressed collateral estoppel (issue preclusion).  ECF Doc. 19 at 1-2.

### 1.      Forfeiture

"[F]orfeiture is the failure to make a timely assertion of a right" or argument.  *See United States v. Olano*, 507 U.S. 725, 733 (1993) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and *Freytag v. Comm'r*, 501 U.S. 868, 894 n.2 (1991)(Scalia, J., concurring)) (distinguishing "forfeiture" from the related concept of "waiver").  In the administrative review context, an argument not raised at the administrative level is deemed "forfeited" and the court will not review it.  *See Maple v. Apfel*, 14 F. App'x 525, 537 (6th Cir. 2001) ("This Court will not review the ALJ's decision with respect to issues not properly raised at the administrative level.").  In a recent decision, the Sixth Circuit added nuance to this rule – holding that a constitutional or structural challenge to the administrative review system was not required to be raised at the administrative level because the Commissioner could not have been reasonably expected to address such an issue in the administrative adjudication context.  *Ramsey v. Comm'r of Soc. Sec.*, No. 19-1579, 2020 U.S. App. LEXIS 27811, at *17-18 (6th Cir. Sept. 1, 2020).  In reaching this holding, the Sixth Circuit distinguished such challenges from issues involving the agency's use of discretion or application of special expertise, which must be raised at the administrative level to preserve judicial review.  *Id.* at *15-18.

An argument can also be "forfeited" if it was raised in only a passing reference or was not adequately developed through citation to the record, statutes, regulations, or caselaw.  *See*

*Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 305 n.2 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited].").  This is because such "skeletal" arguments impermissibly "leav[e] the court to . . . put flesh on [their] bones." *McPherson*, 125 F.3d at 995-96.

The Commissioner is correct that Velazquez's incomplete-record, *res judicata*, and collateral estoppel arguments are forfeited because she failed to raise them at the administrative level.  Velazquez was required to raise her arguments at the administrative level because they involve issues that the Commissioner could have reasonably been expected to address at the administrative level.  *Maple*, 14 F. App'x at 537; *Ramsey*, 2020 U.S. App. LEXIS 27811, at *15-18.  Here, Velazquez could have raised her incomplete-record argument when the ALJ asked if there was anything else to add to the record or if there were any objections to it, and the ALJ's analysis would have been guided by the standards laid out in HALLEX I-2-1-13 (prior claim(s) files).  Her *res judicata* and collateral estoppel arguments could also have been raised at the ALJ hearing or before the Appeals Council, and the adjudicators' analysis would have been guided by the standards laid out in *Drummond*, *Dennard*, AR 98-3(6), AR 98-4(6), and *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933-34 (6th Cir. 2018) (overturning *Drummond*'s overstatement of *res judicata*'s applicability with respect to new claims alleging a distinct period of disability).  Moreover, to the extent Velazquez's statement – that "[t]he ALJ did not raise the issue of *res judicata* in his decision as he was an ALJ from Florida and not from a jurisdiction in the Sixth Circuit" – could be construed to argue that *she* could not have raised her *res judicata* argument at the administrative level, that argument is unavailing.  ECF Doc. 17 at 1.  *Res judicata* is recognized in Florida federal courts and administrative proceedings.  *See Griffin v. Comm'r of Soc. Sec.*, 560 F. App'x 837, 844 (11th Cir. 2014) (applying administrative *res judicata* to a prior

social security decision in *Florida*). And, while citations to Sixth Circuit caselaw might have done little to sway a Florida-based ALJ, Velazquez has not explained why she could not have supported the gravamen of her argument with references to similar Eleventh Circuit precedent. Thus, because Velazquez could have raised her argument at the administrative level but did not, her argument is forfeited. *Maple*, 14 F. App'x at 537; *Ramsey*, 2020 U.S. App. LEXIS 27811, at *15-18.

Similarly, Velazquez's incomplete-record and *res judicata* arguments are forfeited because she failed to develop them with references to the record, statutes, regulations, or caselaw. *Pasiak*, 800 F. App'x at 305 n.2; *McPherson*, 125 F.3d at 995-96; ECF Doc. 13 at 9. And Velazquez's attempt to cure her deficient argumentation and raise a new collateral estoppel argument in her reply brief could not avoid the forfeiture of these arguments. *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517-18 (6th Cir. 2010) (any argument not raised in an initial brief before the district court is waived); *Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 247 (6th Cir. 2018) (claimant forfeited argument raised for the first time in his district court reply brief). Thus, Velazquez forfeited her incomplete-record, *res judicata*, and collateral estoppel arguments when she failed to develop them in her initial brief.

Because Velazquez forfeited her incomplete-record, *res judicata*, and collateral estoppel arguments, I recommend that the Court dismiss the arguments as forfeited and decline to review the arguments on the merits.

### 2. Merits

Even if the court were to review the merits of Velazquez's incomplete-record, *res judicata*, and collateral estoppel arguments, they would still fail. Because Velazquez's claims in this case involved an entirely different alleged disability period (August 21, 2015 through November 9, 2018) than the period in the prior adjudication (ending January 17, 2014), *res*

*judicata* could not require the ALJ to adopt the prior decision.  *See Earley*, 893 F.3d at 933 (explaining that *res judicata* does not bind an ALJ to an earlier adjudication when evaluating an entirely new claim alleging a different disability period).  Collateral estoppel also did not preclude the ALJ from making an independent RFC finding, as the earlier administrative proceedings could not have actually litigated Velazquez's functional capacity from August 21, 2015 through November 9, 2018.  *See Earley*, 893 F.3d at 933 (noting that collateral estoppel "rarely would apply in this setting" because "human health is rarely static" and an earlier adjudication could rarely have "'actually litigated and resolved' whether a person was disabled at some later date.").  Further, while *Earley* permits ALJs to consider prior adjudications in assessing new claims, it does not require them to do so.  *See Earley*, 893 F.3d at 935 ("A later administrative law judge *may* consider what an earlier judge did if for no other reason than to strive for consistent decision making." (emphasis added)).  And, because the ALJ was not *required* to consider the prior adjudication and *did not* consider it, the ALJ was not required to make the decision part of the administrative record.  *See* 42 U.S.C. § 405(g) (providing that the record need only include "the evidence upon which the findings and decision complained of are based").

Velazquez's collateral estoppel argument – that the ALJ *might have* erred by failing to adopt the prior adjudication regarding the requirements of her prior work – would also ultimately fail.  Unlike a claimant's health and functional capacity, which is not static, the requirements of a claimant's prior relevant work are static and could have been reasonably litigated in a prior decision.  *See Earley*, 893 F.3d at 933.  And a failure to adopt a prior adjudication regarding the requirements of a claimant's prior work – if such a failure occurred – could have violated AR 98-3(6) (requiring ALJs to adopt prior findings regarding the requirements of claimants' prior work).  But any error here would have been harmless.  *Rabbers*, 584 F.3d at 654.  Even if we

20

were to assume that the prior adjudication found different requirements for Velazquez's prior work and that Velazquez could not meet those requirements in light of her August 2015 through November 2018 RFC, the regulations would have required only that the ALJ proceed to determine whether Velazquez could have performed other work at Step Five. 20 C.F.R. §§ 404.1520(a)(4)(iv-v), 416.920(a)(4)(iv-v); *Combs*, 459 F.3d at 642-43.  The ALJ did just that. He provided an alternative Step Five finding that Velazquez was "not disabled" based on: (1) the Medical-Vocational Guidelines; and (2) the VE's testimony that an individual with her age, experience, and RFC could work as a laundry worker, dietary aide, and janitor/cleaner.  (Tr. 25-26).  Therefore, because Velazquez has not challenged the ALJ's Step Five finding – and because the ALJ properly evaluated her RFC, as discussed in Section V.E., *infra* – any error that the ALJ *might have* committed in finding that Velazquez could perform her prior work was harmless.  *Rabbers*, 584 F.3d at 654.

Accordingly, even if the Court were to determine that Velazquez's incomplete-record, *res judicata*, and collateral estoppel arguments are not forfeited, I would nevertheless recommend that the Court affirm the Commissioner's final decision on the merits.

### C.      Step Three: Listings Analysis & Social Security Ruling 14-2p

Velazquez argues that the ALJ erred by failing "to consider whether the combination of her documented diabetic complications medically equaled a listing as required by SSR 14-2p." ECF Doc. 13 at 10.  Velazquez asserts that this error resulted in a decision failing to build an "accurate and logical bridge between the evidence documenting [her] disabling problems as set forth in the record[] and the ALJ's decision that she could perform her past work."  ECF Doc. 13 at 11.

The Commissioner responds that the ALJ's Step Three analysis should be summarily affirmed and Velazquez's challenge dismissed because Velazquez has not actually argued that

she met or equaled a particular listing or supported such an argument with references to facts in the record.  ECF Doc. 16 at 6-7.  In the alternative, the Commissioner argues that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in his Listings analysis – including explicitly considering Velazquez's diabetic complications pursuant to SSR 14-2p.  ECF Doc. 16 at 7.

In her reply brief, Velazquez argues that she "had numbness in her extremities, abnormal motor function in her hands, and diabetic neuropathy.  The medical evidence was not addressed by the ALJ.  Rather, he made a summary conclusion.  As such, the ALJ committed harmful error in this matter."  ECF Doc. 17 at 3 (citations omitted).

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

"[Diabetes mellitus] is not listed impairments for adults."  SSR 14-2p (June 2, 2014). Nevertheless, the effects of diabetes mellitus, alone or in combination with other impairments, may meet or medically equal the criteria of a listing.  SSR 14-2p.  Symptoms associated with diabetic neuropathy could meet or medically equal the severity of a neurological disorder (Sections 11.00-11.21).  SSR 14-2p.

Velazquez's argument – that the ALJ failed to comply with SSR 14-2p when he failed to consider whether her diabetic complications met or medically equaled a listed impairment – is

meritless.  The record reveals that the ALJ complied with the regulations when he: (1) expressly stated that SSR 14-2p provided that diabetes mellitus was not a listed impairment but that its effects could meet or medically equal a listed impairment; and (2) proceeded to consider whether Velazquez met any listing under Listings 1.00 *et seq.*, 2.00 *et seq.*, 4.00 *et seq.*, 5.00 *et seq.*, 6.00 *et seq.*, 8.00 *et seq.*, 11.00 *et seq.*, 12.00 *et seq.*, and "others."  *Foster*, 279 F.3d at 354; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); SSR 14-2p; (Tr. 20-21).  A review of the ALJ's decision also shows that the he expressly considered Velazquez's complaints and associated medical records regarding her alleged extremity numbness, neuropathic pain, and decreased motor function in her hands.  *See* (Tr. 22-23).  Moreover, to the extent Velazquez claims that she actually met or medically equaled any particular listing, she has not cited what that listing may be.  *See generally* ECF Doc. 13; ECF Doc. 17.  And this court cannot construct her argument for her.  *See McPherson*, 125 F.3d at 995-96; *see also Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that, even when a litigant has no attorney and is entitled to liberal construction, the courts will not "conjure up questions never squarely presented to them[ because] judges are not mind readers[ and] they cannot be expected to construct full blown claims from sentence fragments.").  Thus, any argument that she met a listing or that the ALJ failed to reach a conclusion supported by substantial evidence in concluding that she did not meet a particular listing is forfeited.  *Pasiak*, 800 F. App'x at 305 n.2; *McPherson*, 125 F.3d at 995-96.

Accordingly, because the ALJ applied proper legal standards and complied with SSR 14-2p by considering whether Velazquez's diabetic conditions met or medically equaled a Listing and because Velazquez has forfeited any argument that she actually met any particular Listing, I recommend that the court affirm the ALJ's Step Three analysis.

### D.    Step Four: Subjective Symptom Complaints & Social Security Ruling 16-3p

Velazquez next argues that the ALJ erred and failed to reach a decision supported by substantial evidence when he "failed to find [her] testimony credible." ECF Doc. 13 at 12-13. Velazquez asserts that the ALJ had based his credibility determination on a "September 2016 normal EMG," but failed to mention: (1) a "July 2014 EMG showing mild right medial nerve compression neuropathy along with changes of the left carpal tunnel syndrome"; (2) her treating neurologist's assessment that she had carpal tunnel syndrome and abnormal motor function in her hands; and (3) Dr. Gargasz's January 2017 finding that she had "problems with both her hands" and operation on her ganglion cyst and right-hand trigger releases. ECF Doc. 13 at 13. Velazquez asserts that the ALJ's credibility finding violated SSR 16-3p and led to an erroneous finding that she was capable of performing her past relevant work. ECF Doc. 13 at 13.

The Commissioner responds that the ALJ did not violate SSR 16-3p in assessing Velazquez's credibility, but instead complied with the ruling by considering whether Velazquez's subjective complaints were consistent with objective medical and other evidence in the record. ECF Doc. 16 at 8. Further, the Commissioner argues that the ALJ adequately considered the record evidence and that substantial evidence – including the records Velazquez promotes in her brief – supported the ALJ's decision. ECF Doc. 16 at 8-10.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Before March 2016, the Social Security Administration characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996) (superseded). In SSR 16-3p, the Social Security Administration that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-

regulatory policy.  SSR 16-3p, 2016 SSR LEXIS 4 (Oct. 25, 2017).  The Social Security Administration explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

In conducting this *consistency* analysis, an ALJ is not required to accept the claimant's complaints at face value but may discount them based on several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Jones*, 336 F.3d at 475–76 ("[A]n ALJ is not required to accept a claimant's subjective complaints."); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The ALJ need not exhaustively discuss each of these factors or all of the evidence in the record but need only acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied proper legal standards in assessing Velazquez's subjective symptom complaints. Here, the ALJ did not make any remarks regarding Velazquez's "credibility," but instead complied with the regulations by examining the consistency of her subjective complaints with the objective medical and other evidence. SSR 16-3p, 2016 SSR LEXIS 4; (Tr. 22-23). Further, Velazquez's argument that the ALJ did not discuss certain evidence in evaluating her subjective complaints is unavailing. The ALJ was not required to discuss *all* the evidence in the record. *Jones*, 336 F.3d at 475–76. Instead, the ALJ complied with the regulations by summarizing Velazquez's testimony and the medical evidence that supporting his conclusion that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Jones*, 336 F.3d at 475–76; *Temples*, 515 F. App'x at 462.

Substantial evidence also supported the ALJ's conclusion that Velazquez's subjective complaints were inconsistent with the medical and other evidence. Such evidence included: (1) treatment notes from nurse Brugger, nurse La Puente, nurse Argote, Dr. Kamat, Dr. Gargasz, and nurse Noggle indicating that examination findings showed normal musculoskeletal systems, sensation, reflexes, gait, station, and balance; (2) consistent recommendations that Velazquez could improve her condition through diet and exercise; (3) Dr. Gupta's examination findings showing that Velazquez had a normal spine, normal reflexes, normal sensation, normal posture, intact neurology, no evidence of joint issues, excellent grip strength in both hands, fine manipulation in both hands, and the ability to walk, stand, and sit with ease; (4) Dr. Kamat's September 2016 NCV and EMG findings that all nerve conduction was normal and Velazquez's muscles; and (5) Velazquez's 2014 report that she had 0/10 pain, August 2016 statement that she could walk for half a mile, and May 2017 statement in a call to Dr. Gargasz's office that she had

no pain and could straighten her fingers after her trigger release surgery.  (Tr. 309, 327, 334, 340-41, 468, 474-77, 487, 492-93, 509-11, 516, 571-72, 579-84, 586, 594-95, 600-01, 605-07, 631-32, 727, 732-33, 743-44, 749-50, 755-58, 766-69).  And, even if the evidence Velazquez cites in her brief could have supported a finding that her subjective complaints were consistent with other evidence, this court may not second guess the ALJ's finding when substantial evidence supported it.  *Biestek*, 139 S. Ct. at 1154; *O'Brien*, 2020 U.S. App. LEXIS 25007, at *15; *Jones*, 336 F.3d at 476-77; *Rogers*, 486 F.3d at 241.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, his finding that Velazquez's subjective complaints were inconsistent with other evidence in the record fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, I recommend that the court affirm the ALJ's subjective symptom complaint analysis.

### E.        Step Four: RFC & Ability to Perform Prior Work[2]

Velazquez argues that the ALJ "committed harmful error" by failing to include in the RFC finding limitations based on her diabetic neuropathy – specifically, (1) "standing and/or walking only three hours a day," and (2) "no more than occasional handling and fingering."  ECF Doc. 13 at 14.  She further contends that the ALJ failed to comply with regulations when "he did not properly evaluate the cumulative effects of [her] impairments, including her depression, problems with her hands, and neuropathy in her extremities."  ECF Doc. 13 at 15.  Velazquez asserts that, because the VE testified that someone with the standing/walking and

---

[2] Although Velazquez captions her argument as "the ALJ improperly found that Velazquez could return to her past jobs as an assembler and/or child monitor," the substance of her argument is primarily a challenge to the ALJ's RFC finding.  ECF Doc. 13 at 13-15.

handing/fingering limitations she identified could not perform any work, the ALJ's failure to include those limitations in the RFC was not harmless.  ECF Doc. 13 at 15.

The Commissioner responds that, because Velazquez's argument is captioned "The ALJ improperly found that Velazquez could return to her past jobs as an assembler and/or child monitor," any error alleged in the argument was harmless because Velazquez did not challenge the ALJ's alternative Step Five finding that she could perform other work in the national economy.  ECF Doc. 16 at 11.  The Commissioner also argues that Velazquez's argument regarding leg neuropathy and depression are waived because she has not adequately developed the argument.  ECF Doc. 16 at 11.  Further, the Commissioner contends that the ALJ adequately explained his decision not to include additional limitations in the RFC and that substantial evidence supported his decision.  ECF Doc. 16 at 12.

In her reply brief, Velazquez argues – for the first time – that, had the ALJ found that she was limited to only light or sedentary work instead of medium work, the Medical-Vocational Guidelines would have directed a "disabled" finding.[3]  ECF Doc. 17 at 3.

At Step Four, the claimant has the burden to establish that she is unable to perform her past relevant work in light of her RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *see also Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (explaining that a claimant challenging a finding that she was able to perform past relevant work had "fail[ed] to provide [the court] with the factual record [the court] need[ed] to find in her favor").  In evaluating whether a claimant can perform her past relevant work, the ALJ must compare the requirements of the claimant's past work with her RFC to determine whether she can still meet

---

[3] This argument is related to Velazquez's possibility-of-*res-judicata* argument.  *See* ECF Doc. 17 at 3 ("In addition to the arguments previously made as to the contention that Plaintiff could not perform work at the medium level of exertion, the question remains as to the issue of *res judicata* in this matter.").

the physical and mental demands of that work.  20 C.F.R. §§ 404.1560(b), 416.960(b).  Relevant

evidence includes: (1) the claimant's vocational documentation; (2) the claimant's statements

about her past work requirements and why she believes she can no longer perform them;

(3) medical evidence in the record; and (4) "supplementary or corroborative information from

other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements

of the work as generally performed in the economy."  SSR 82-62, 1982 SSR LEXIS 27, at *6-7

(1982); 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).  VE testimony is also an important

resource, and a "response to a hypothetical question about whether a person with the physical

and mental limitations imposed by the claimant's medical impairments can meet the demands of

the claimant's previous work" may be substantial evidence supporting a conclusion that the

claimant can perform her past relevant work.  20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see

also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (A VE's testimony in

response to a hypothetical question is substantial evidence if the hypothetical accurately reflected

the claimant's RFC as found by the ALJ); *cf. Wright-Hines*, 597 F.3d at 396 (noting that an ALJ

has an "inquisitorial duty to seek clarification on material facts" in evaluating a claimant's ability

to perform past relevant work).

   The ALJ's RFC finding is a vital component of the Step Four prior-work evaluation.  20

C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work

despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing

20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing

RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's

impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant

evidence includes a claimant's medical history, medical signs, laboratory findings, and

statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied proper legal standards in evaluating Velazquez's RFC and in finding that she was able to perform her past work.  The ALJ complied with the regulations in assessing Velazquez's RFC when he "considered all symptoms" – including her nonsevere impairments – in light of the medical and other evidence.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 22-23).  Such evidence included Velazquez's own testimony, treatment notes, diagnostic imaging, and the state agency consultants' opinions from the relevant period.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 22-23).  Likewise, the ALJ applied proper legal standards in evaluating whether Velazquez was able to perform her prior work by considering her vocational documentation, her testimony, the medical records supporting the RFC assessment, and the VE's testimony.  SSR 82-62, 1982 SSR LEXIS 27, at *6-7; 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *Howard*, 276 F.3d at 238; *Wright-Hines*, 597 F.3d at 396; (Tr. 22-25).  And, as discussed in Section V.B.2., *supra*, any error in the conclusion that Velazquez was able to perform her prior work was harmless – if not forfeited – because Velazquez has not challenged the ALJ's alternative Step Five finding that she was able to perform other work in the national economy.

Substantial evidence also supported the ALJ's RFC assessment, including: (1) all the evidence supporting the ALJ's subjective symptom complaints analysis cited in Section V.D., *supra*; and (2) the state agency consultants' opinions indicating that Velazquez did not have any severe impairments limiting her functional capacity.  (Tr. 76-80, 94-100, 309, 327, 334, 340-41, 468, 474-77, 487, 492-93, 509-11, 516, 571-72, 579-84, 586, 594-95, 600-01, 605-07, 631-32, 727, 732-33, 743-44, 749-50, 755-58, 766-69).  And, because the ALJ's hypothetical question to the VE accurately reflected Velazquez's RFC, the VE's testimony was substantial evidence

supporting the ALJ's finding that Velazquez could perform her prior work and alternative finding that she could perform other work in the national economy.  *Howard*, 276 F.3d at 238; *Wright-Hines*, 597 F.3d at 396; (Tr. 21, 24-25, 51-53).  Thus, the ALJ's conclusion that Velazquez had the RFC to perform a range of work at all exertional levels, could perform her prior work, and could perform other work in the national economy fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.

I recommend that the Court affirm the ALJ's RFC and prior work findings.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Velazquez's applications for DIB and SSI be affirmed.

Dated: October 8, 2020

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).